1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KEITH UNDRAY FORD,                        No.  2:15-cv-2463 MCE GGH P

12                  Petitioner,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   SUZANNE M. PEERY, Warden,

15                  Respondent.

16

17   _____

18   *Introduction and Summary*

19        Petitioner, Keith Ford, in his well-written petition/traverse, seeks to vacate his conviction

20   for first degree murder.  As issues he presents:

21        1.      The prosecutor's comment in final argument to the effect that the "presumption of

22   innocence was over," and "petitioner was not presumed innocent anymore" violated due process

23   and was not harmless error;

24        2.      The trial court's response to the jury's question violated due process and was not

25   harmless;

26        3.      Ineffective assistance of counsel insofar as counsel did not object to the trial

27   judge's response to the jury question;

28

                                    1

4.      It cannot be determined whether the jury convicted petitioner on a legally incorrect theory;

5.      Improper admission of a Facebook post/message;

6.      Cumulative error.

For the reasons discussed at length herein, the petition should be denied.

<u>BACKGROUND FACTS</u>

The facts as found by the California Court of Appeal are set forth below:

Ruben Martinez was shot and killed outside his girlfriend's house in Vallejo.  The People charged Ford with the first degree murder of Martinez (§ 187, subd. (a)) and alleged various firearm use sentencing enhancements (§ 12022.53, subds. (b), (c) (d)).

Prosecution Evidence:
In August 2010, then 20–year–old Martinez attended college and worked as a car salesman.  Martinez owned a blue SUV with big rims and tinted windows.  Martinez treasured the car and washed it several times a week.  On an August 2010 night, Martinez planned to go to a family party with his girlfriend, Jessica Blanco.  He washed the SUV before their date.

Around 10 p.m., Martinez picked Blanco up at her house in Vallejo.  His car was "really clean and shiny."  Martinez decided he wanted to see a movie instead of attending the family party, so he and Blanco returned to Blanco's house so she could "check the movie times and get a jacket."  As they approached Blanco's street, Blanco noticed a white car.  It had been driving in the same direction as Martinez's car, but then made an abrupt U-turn directly in front of Martinez's car and drove away in the opposite direction.

Martinez reached Blanco's house.  He stopped the SUV in front of her house but left the engine running.  Martinez sat in the driver's seat and the white light from his cell phone was visible from outside the car.  Blanco got out of the car and went into her house to use the bathroom.  While inside, she heard a "really loud popping noise" and "a screeching noise, tires peeling, gravel."  Blanco went outside and saw Martinez's car had crashed into a neighbor's house, the engine still revving and tires spinning.  Martinez was slumped in the driver's seat, dead from a gunshot wound in his head.

A neighbor, Bethel J., and her daughter, Tenley, lived across the street from Blanco.  They were across the street from Blanco's house when Bethel saw Martinez's car parked in front of Blanco's house and a person in the driver's seat using a cell phone.  Bethel and Tenley saw three young African American men walking toward them.  Tenley's dog charged at one of the men, who appeared to

2

be in his early twenties.  Tenley "couldn't really" see that man's face because it was dark, but she noticed he had short hair cut close to his scalp.  The man was "skinny" and taller than she.  Initially, that man was with his two companions, but he started walking faster and separated from the two other men.  One of the other men had dreadlocks and was wearing a hooded sweatshirt.

A fingerprint examiner found a latent palm print on the driver's side door of Martinez's SUV, just beneath the window.  The latent print matched Ford's left palm print.  The fingerprint examiner was certain "both impressions were made by the same palm."  A few days after Martinez died—but before the fingerprint results were in—a Vallejo detective stopped Ford driving a white Oldsmobile sedan.  Ford was 23 years old and was wearing short hair in a "fade."  There were six cell phones in the center console of Ford's car, which Ford said he "bought [ ] stolen off the streets."  Ford told the detective he was at his mother's house in Vallejo, about three miles from Blanco's residence, on the night Martinez was shot.  Ford did "not remain in custody" and the detective did not speak to Ford again until December 2010, when Ford was in jail for an unrelated firearm possession charge.2

Ford called his girlfriend while he was in jail for the unrelated offense and before he was charged with Martinez's murder.  In a recorded conversation, Ford said, "luckily I aint in here for murder, that's all I keep thinking about.... oh well I wish it didn't have to happen...."  He also said, "I just [wish] I was at home.... I know I gotta deal with my [unintelligible] it's too late for all that ... to be wishin I was at home....  See I'm disappointed in myself.  But [expletive] that's what happens when you carry a gun.  Ain't nothin good gonna come of it.  And I know this and [expletive] still happen, cause I tell other people the only thing you gonna get out of a gun is you gonna throw down with it or you gonna shoot somebody with it.  And I tell everybody that and look at my [expletive]."

Several months after Martinez's murder, Ford posted the following message on his Facebook page:  "I heard through the grapevine you was looking for the guy.  Let me know something.  And since you think I popped you, check this out.  First off, I don't [expletive] with the Vistas.  Second off, I am too good of a shooter to hit a nigga that many times and not knock they ass down.  Last, when you getting shot, I was on Fifth buying some syrup off Jigs.  Plus, I don't even [expletive] with niggas, so ain't nobody talked to me since I got out of jail last.  Real killers move in silence.  And would I brag on a job I didn't even complete?  Niggas knocking [expletive] down.  I don't need credit for an attempt, so take that how you want to."3

The police arrested Ford for Martinez's murder.  When told his palm print was on the door of Martinez's car, Ford responded, "[T]hat don't mean nothing.  That just means I came in contact with the vehicle at one time or another."  Ford did not explain how he "came in contact" with Martinez's car "at one time or another."

People v. Ford, 2014 WL 4446166 *1-2 (Cal. App., First District, 2014)

1

AEDPA STANDARDS

2       The statutory limitations of federal courts' power to issue habeas corpus relief for persons

3   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

4   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) provides:

5           An application for a writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court shall not be granted with respect to any
6           claim that was adjudicated on the merits in State court proceedings unless the
            adjudication of the claim–
7
            (1) resulted in a decision that was contrary to, or involved an unreasonable
8           application of, clearly established Federal law, as determined by the Supreme
            Court of the United States; or
9
            (2) resulted in a decision that was based on an unreasonable determination of the
10          facts in light of the evidence presented in the State court proceeding.

11

12       For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings

13   of the United States Supreme Court at the time of the last reasoned state court decision.

14   Thompson v. Runnels, 705 F.3d 1089, 1095 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34,

15   39 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) citing Williams v. Taylor, 529

16   U.S. 362, 405–06 (2000).  Circuit precedent may not be "used to refine or sharpen a general

17   principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has

18   not announced."  Marshall v. Rodgers, ___ U.S. ____, ____, 133 S.Ct. 1446, 1450 (2013) citing

19   Parker v. Matthews, 567 U.S. 37, 41 (2012).  Nor may it be used to "determine whether a

20   particular rule of law is so widely accepted among the Federal Circuits that it would, if presented

21   to th[e] [Supreme] Court, be accepted as correct.  Id.

22       A state court decision is "contrary to" clearly established federal law if it applies a rule

23   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

24   precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

25   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

26   writ if the state court identifies the correct governing legal principle from the Supreme Court's

27   decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Lockyer v.

28   Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

4

1   (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

2   court concludes in its independent judgment that the relevant state-court decision applied clearly

3   established federal law erroneously or incorrectly.  Rather, that application must also be

4   unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

5   (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

6   review of the legal question, is left with a 'firm conviction' hat the state court decision was

7   'erroneous.' ").  "A state court's determination that a claim lacks merit precludes federal habeas

8   relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

9   decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

10  U.S. 652, 664 (2004)).[1]  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

11  court, a state prisoner must show that the state court's ruling on the claim being presented in

12  federal court was so lacking in justification that there was an error well understood and

13  comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington,

14  562 U.S. at 103.  "Evaluating whether a rule application was unreasonable requires considering

15  the rule's specificity.  The more general the rule, the more leeway courts have in reaching

16  outcomes in case-by-case determinations."  Id at 101.  Emphasizing the stringency of this

17  standard, which "stops short of imposing a complete bar of federal court relitigation of claims

18  already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

19  strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id.

20  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state

21  court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) *quoting* Harrington,

22  562 U.S. at 98.

23  _____

[1]  The undersigned also finds that the same deference is paid to the factual determinations of state

24  courts. Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence

25  presented in the state court proceeding."  Stanley, 633 F.3d at 859 *quoting* Davis v. Woodford,
    384 F.3d 628, 638 (9th Cir. 2004)). It makes no sense to interpret "unreasonable" in § 2254(d)(2)

26  in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error
    must be so apparent that "fairminded jurists" examining the same record could not abide by the

27  state court factual determination. A petitioner must show clearly and convincingly that the factual
    determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

28

1    The court looks to the last reasoned state court decision as the basis for the state court

2    judgment. Stanley, 633 F.3d at 859.  If the last reasoned state court decision adopts or

3    substantially incorporates the reasoning from a previous state court decision, this court may

4    consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475

5    F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "[Section] 2254(d) does not require a state court to

6    give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"

7    Harrington, 562 U.S. at 100.  Rather, "[w]hen a federal claim has been presented to a state court

8    and the state court has denied relief, it may be presumed that the state court adjudicated the claim

9    on the merits in the absence of any indication or state-law procedural principles to the contrary."

10   Id. at 99.  This presumption may be overcome by a showing "there is reason to think some other

11   explanation for the state court's decision is more likely."  Id. at 99-100 (citing Ylst v.

12   Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's

13   claims rejects some claims but does not expressly address a federal claim, a federal habeas court

14   must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson

15   v. Williams, ___ U.S. ____, ____, 133 S.Ct. 1088, 1091 (2013).

16   The state courts need not have cited to federal authority, or even have indicated awareness

17   of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 8 (2002).  Where the

18   state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

19   federal habeas court independently reviews the record to determine whether habeas corpus relief

20   is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853

21   (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional

22   issue, but rather, the only method by which we can determine whether a silent state court decision

23   is objectively unreasonable."  Id at 853.  Where no reasoned decision is available, the habeas

24   petitioner still has the burden of "showing there was no reasonable basis for the state court to

25   deny relief."  Harrington, 562 U.S. at 98.  A summary denial is presumed to be a denial on the

26   merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).

27   While the federal court cannot analyze just what the state court did when it issued a summary

28   denial, the federal court must review the state court record to determine whether there was any

6

1    "reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98. This court "must

2    determine what arguments or theories...could have supported, the state court's decision; and then

3    it must ask whether it is possible fairminded jurists could disagree that those arguments or

4    theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

5         When it is clear, however, that a state court has not reached the merits of a petitioner's

6    claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

7    habeas court must review the claim de novo.  Stanley, 633 F.3d at 860.

8                                   DISCUSSION

9    A.    Prosecutor's Comment on the Presumption of Innocence

10        The state Court of Appeal set forth the pertinent facts in a well stated, concise fashion:

11        Ford argues the prosecutor committed misconduct during closing argument by
12        telling the jury the "'presumption of innocence is over'" and Ford is "'not
          presumed innocent anymore.'"  At the end of closing argument, the prosecutor
13        stated: "I've provided you with all the information that you need to feel the
          abiding conviction in the truth of these charges.  I have provided the information
14        for you to make that decision.  You should be comfortable with that decision.  I
          want you to be comfortable with that decision and again, as I indicated before, to
15        follow through with your promise to not hesitate to convict once the case has been
          proven to you beyond a reasonable doubt.  [¶] This idea of this presumption of
16        innocence is over.  Mr. Ford had a fair trial.  We were here for three weeks where
17        ... he gets to cross-examine witnesses; also an opportunity to present information
          through his lawyer.  He had a fair trial.  This system is not perfect, but he had a
18        fair opportunity and a fair trial.  He's not presumed innocent anymore .... [¶]  And
          so we're past that point.  We're at the point now where you go back, look at the
19        information that you have before you, consider all that information.  And again, I
20        want you to feel comfortable with your decision and you should feel comfortable
          with your decision."  (Italics added.)
21
22        Defense counsel objected that the prosecutor misstated the law.  Outside the
          presence of the jury, defense counsel asked the court to give "a limiting instruction
23        ... letting the jury know that they have to deliberate first before the presumption
          falls."  The prosecutor claimed his comment was an "entirely appropriate
24        argument.  All the evidence is in."  The court agreed, overruled defense counsel's
          objection, and declined to give a limiting instruction.
25
          The prosecutor resumed his closing argument, "And so we're past that point.
26        We're at the point now where you go back, look at the information that you have
27        before you, consider all that information.  And again, I want you to feel
          comfortable with your decision and you should feel comfortable with your
28        decision. [¶]  Again, palm print, left palm print in the exact location where a right-

                                        7

1
2
3
4

handed shooter would be; victim having a cell phone within a minute or so of his death; the defendant having those multiple cell phones in his car five days after; the Facebook posts; the two jail calls; and no motive for anyone else to kill [Martinez].  And the evidence is no alibi information from the defendant.  And the evidence before you, when you take all of that information together, is that the defendant is guilty of murder."

5    People v. Ford, at *6.

6        The Court of Appeal reviewed several California cases which came to different

7    conclusions about misconduct in this context.  It is fair to say that under California law, the

8    presumption of innocence continues into the jury deliberations, until the jury determines the

9    evidence proves otherwise beyond a reasonable doubt.  People v. Ford citing People v. Booker,

10   51 Cal. 4th 141, 185 (2011).  The same appears to be the federal rule.  Portuondo v. Agard, 529

11   U.S. 61, 76 (Stevens, J. concurring) (2000).  However, in Booker and People v. Goldberg, 161

12   Cal. App. 3rd 170, 189 (1984) and People v. Panah, 35 Cal. 4th 395, 463 (2005), the courts held

13   that no misconduct occurred when the prosecutor announced in argument that the presumption of

14   innocence was over, at least no actionable misconduct, because the comments, fairly viewed,

15   were simply prosecutorial rhetoric that the prosecution had proved its case.  In People v. Dowdell,

16   227 Cal. App. 4th 1388 (2014), the court found that two final argument comments concerning the

17   presumption-of-innocence-was- over, and that defendant had received his fair trial, were

18   misconduct, but ultimately non-prejudicial.  In this case the Ford court ultimately opined that it

19   did not have to choose between these California cases because, in any event, any asserted error

20   was harmless under California and federal standards.

21       However, the dispositive point in this AEDPA habeas is not how California courts have

22   treated the issue, misconduct or not, but whether their treatment, and the Ford case itself, runs

23   contrary to law established by the United States Supreme Court.  The parties do not cite, and the

24   court is not aware of, any direct Supreme Court holdings involving alleged prosecutorial

25   misconduct in declaring the "presumption of innocence" "over" during final argument.  Rather,

26   only those cases which generally define prosecutorial misconduct are set forth.[2]  The threshold

27
28

[2]  [I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  Darden v. Wainwright, 699 F.2d, at 1036.  The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a

1   issue is therefore, whether generalized holdings about prosecutorial misconduct can be

2   extrapolated to the present situation.  The undersigned thinks not.

3       The Supreme Court has cautioned against extrapolations of its holdings to other situations.

4   Carey v. Musladin, 549 U.S. 70 (2006).  This analogous-in-principle case involved an assertion

5   that established precedent involving state sponsored activities impinging on a fair trial, e.g.

6   requiring a prisoner to wear prison attire during trial, having multiple law enforcement personnel

7   standing guard during trial, could be extrapolated to a situation where *spectators* had occasioned

8   the unfairness by wearing buttons depicting the murder victim.  The Supreme Court found that

9   the issue of non-court personnel causing the unfairness was a different issue, and hence, there was

10  no established Supreme Court precedent on the spectator issue for AEDPA purposes.  In

11  surveying Supreme Court precedent, it appears that when a specific practice is essentially alleged

12  to be erroneous as a matter of law, here the statement during final argument that "the presumption

13  of innocence is over," extrapolations become rare indeed.  Rather, general holdings of the

14  Supreme Court, if extended at all, appear to be used generally for case-specific factual

15  controversies, e.g., use of Strickland v. Washington, 466 U.S. 668 (1984), to analyze such

16  factually intensive things as unreasonable actions of counsel to determine adequacy of  case

17  investigation, or failure to object, or failure to call a witness and the like.  The undersigned first

18  finds here, therefore, that petitioner's prosecutorial misconduct claim should be denied because of

19  the absence of declared Supreme Court authority.

20      Nor does petitioner's citation of United States v. Perlaza, 439 F.3d 1149 (9th Cir. 2006),

21  advance his case.  This is so for two reasons.  First, this Circuit federal authority may not be used

22  to "sharpen" or "refine" generalized Supreme Court holdings.  Marshall v. Rogers, supra.

23  Secondly, although one part of the Perlaza case involved the prosecutor declaring the

24  presumption of innocence over, it also involved the prosecutor utilizing a more egregious

25  "presumption of guilt" argument.  Even the Ninth Circuit is loath to extend Perlaza to situations

26

27  denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  Moreover, the
    appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of
    due process, and not the broad exercise of supervisory power."  Id., at 642.  Darden, 477 U.S. 168
28  (1986).

1    where the prosecutor has used the--presumption-of-innocence-is-over-- rubric simply as a means

2    to emphasize that the prosecution has proven the case beyond a reasonable doubt.  See United

3    States v. Bell, 337 Fed. Appx. 663 (9th Cir. 2009).

4           Finally, even if the undersigned has been too stingy in extrapolating generalized holdings

5    on prosecutorial misconduct to the present situation for analytical purposes, it is clear beyond

6    peradventure or doubt that reasonable jurists, like the justices in petitioner's case or other

7    California cases, or even in the Ninth Circuit, could place petitioner's case in the non-actionable

8    misconduct category.  That is, the conduct here, even though it involves two assertions that the

9    presumption of innocence was over, was made in the context of simply arguing that the evidence

10   had shown petitioner guilty under the reasonable doubt instructions given by the court. Such

11   prosecutor conduct could not be construed as infecting the fairness of the entire proceedings.

12   Footnote 2, supra. The Ford court is not to be AEDPA second-guessed here.  No further analysis

13   of this claim need be made.

14   B.       The Trial Court's Response to a Juror Question

15          Petitioner argues that the trial judge did not adequately respond to a question by the jury

16   involving whether it could "imply guilt" for an active participant in the robbery, but who was not

17   the actual shooter of the robbery victim.  The argument continues: since the answer must have

18   been "no" yet the jury decided the case on an aider and abettor theory, a theory not instructed

19   upon.  Further, since the jury did not find petitioner to have used a firearm on the enhancement

20   issue, this "proves" the jury went astray to find guilt on a non-presented theory, as the jury could

21   not have found petitioner to be the shooter for murder purposes, but not have "used a firearm" for

22   enhancement purposes.  At the very least, petitioner insists, the verdicts were inconsistent.  There

23   are many twists and turns to these complicated claims, but eventually, the arguments fall short.

24          This issue is set up by the discussion in the state appellate opinion:

25          During deliberations the jury asked the court: "If someone believes that the
            defendant was present at the time of the shooting and was an active participant in
26          the attempted robbery, but was not the actual shooter, does that imply guilt of
            either the first or second degree murder charge?"  The court's initial thought was
27          "the answer would simply be 'No.'  Even if somebody was a co-participant who
28

                                                      10

did the killing ... there are other elements to the intent to aid and abet."  Defense counsel agreed, saying "since we didn't argue" aiding and abetting "and we didn't present it in instruction or through testimony ... it is too late."  Defense counsel urged the court to refer the jury to the instructions.

The prosecutor asked the court to read CALCRIM No. 35306 and advise the jury "the Court is not going to provide the law on that issue because the evidence does not support that factual scenario."  Defense counsel objected, arguing it would be inappropriate for the court to comment on the evidence.  As defense counsel explained,  "The statement that [the prosecutor] would like the Court to read to the jury that the evidence does not support that factual scenario, that might be the prosecutor's position, but I think if the Court gives that statement, the Court is basically indicating the Court's position. [¶]  It could be taken by the jury as a Court position and the Court would be risking directing a verdict or [ ] usurp[ing] the jury's ultimate fact-finding power, even simply by suggesting what the evidence actually is without them determining what the actual evidence is."

Defense counsel continued, "The evidence does support the possibility that somebody else is the shooter because there was somebody else who does not meet the general generic description of Mr. Ford, and that's the person who was seen by Bethel J[.] in the black hoodie with the dreadlocks on that side of the street walking towards the SUV. [¶]  So there is evidence to support that, and I think the Court ... can only tell the jury to refer back to the testimony that they heard and to refer to the jury instructions as given."  The court agreed that telling the jury the evidence did not support that factual scenario "may be taking away a factual decision by the jury."

The prosecutor then proposed a "similar" but more "neutral" response, to which defense counsel objected.  The court agreed with defense counsel and stated, "I think what I am inclined to do is simply something to the effect of 'You've received all of the evidence and all of the law pertaining to this case.'  I think that's, in essence, what you're asking."  Defense counsel responded, "Right."  Then the court said, "So the response would be, 'You have received all of the evidence and all of the law pertaining to this case,'" and defense counsel stated she had no objection. When the court read the proposed response—"'You have received all of the evidence and all of the law pertaining to the this case'"— defense counsel said, "I think what the Court read is sufficient."  The court then responded to the jury's question and defense counsel reiterated her agreement with the court's response, noting it was proper because it referred the jury "to the law and they have the law and they can state it for themselves."

People v. Ford at *3-4.

The jury went on to find petitioner guilty of murder under one or both of the theories presented at trial, but confusingly could not find that petitioner used a firearm against the victim.

////

11

The Court of Appeal first held that the issue had been waived because defense counsel had agreed, tacitly or overtly, to the trial judge's actions in response to the jury question.  However, because petitioner brings a related ineffective assistance of counsel claim on this same issue, see infra, the procedural default ruling on the straight error claim is of little practical consequence here.  Therefore, the undersigned reaches the merits of the claim as did the Court of Appeal in the alternative.

The Court of Appeal assumed for the sake of argument that petitioner was correct in his state law supplemental jury instruction error assertion, and decided the claim adversely to petitioner on the lack of any requisite harm.  However, the undersigned ultimately finds that no error occurred in the first place.  The discussion commences with a general discussion of the felony murder rule, and proceeds to the circumstances of this case.

Petitioner specifically asserts herein that the jury was permitted to decide the case on an unproved, even unnoticed, aider and abettor theory due to the refusal of the trial judge to answer "no," to the jury's question, and based on the fact that the jury did not find petitioner to be the actual shooter.  However, the jury was presented not only with a purposeful murder claim, but also was presented with a felony murder theory—a theory which normally does *not require* that petitioner be the shooter, nor even of an aiding and abetting mentality.

> "All murder ... which is committed in the perpetration of, or attempt to perpetrate [certain enumerated felonies including robbery and burglary] ... is murder of the first degree."  (Pen.Code, § 189.)  The mental state required is simply the specific intent to commit the underlying felony (People v. Gutierrez (2002) 28 Cal.4th 1083, 1140, 124 Cal.Rptr.2d 373, 52 P.3d 572), since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute.  (People v. Roberts (1992) 2 Cal.4th 271, 316, 6 Cal.Rptr.2d 276, 826 P.2d 274 ["the consequences of the evil act are so natural or probable that liability is established as a matter of policy"]; People v. Washington (1965) 62 Cal.2d 777, 780, 44 Cal.Rptr. 442, 402 P.2d 130; 2 La Fave, *Substantive Criminal Law* (2d ed.2003) § 14.5(b), p. 449.)  "Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances."  (People v. Burton (1971) 6 Cal.3d 375, 387–388, 99 Cal.Rptr. 1, 491 P.2d 793 (Burton ).)

****

12

Defendants make little effort to grapple with the policies underlying the felony-murder rule and rely instead almost entirely on our oft-repeated observation in People v. Vasquez (1875) 49 Cal. 560 (Vasquez ) that "'[i]f the homicide in question was committed by one of [the nonkiller's] associates engaged in the robbery, in furtherance of their common purpose to rob, he is as accountable as though his own hand had intentionally given the fatal blow, and is guilty of murder in the first degree.'" (Id. at p. 563, italics added.)  Relying on Vasquez, defendants claim the felony-murder rule requires proof that the homicidal acts have advanced or facilitated the underlying felony.  Defendants misread Vasquez.  In the century and a quarter since Vasquez was decided, we have never construed it to require a killing to advance or facilitate the felony, so long as some logical nexus existed between the two.  To the contrary, in People v. Olsen (1889) 80 Cal. 122, 125, 22 P. 125 (Olsen ), overruled on other grounds in People v. Green (1956) 47 Cal.2d 209, 227, 232, 302 P.2d 307, we upheld an instruction that based a nonkiller's complicity on a killing that was committed merely "in the prosecution of the common design "—and, in Pulido, we observed that this instruction was "similar" to the Vasquez formulation.  (Pulido, supra, 15 Cal.4th at 720, 63 Cal.Rptr.2d 625, 936 P.2d 1235.)  The similarity, of course, is that both require a logical nexus between the homicidal act and the underlying felony.  Although evidence that the fatal act facilitated or promoted the felony is unquestionably relevant to establishing that nexus, California case law has not yet required that such evidence be presented in every case.  Such a requirement finds no support in the statutory text, either. Penal Code section 189 states only that "[a]ll murder ... which is committed in the perpetration of, or attempt to perpetrate" the enumerated felonies "is murder of the first degree." (Pen.Code, § 189.) Nowhere has the Legislature imposed a requirement that the killer intend the act causing death to further the felony. We are therefore reluctant to derive such a requirement from the "in furtherance" discussion in our case law, which is itself only a court-created gloss on section 189.

People v. Cavitt, 33 Cal. 4th 187, 197-199 (2004).

The Cavitt case speaks (almost) directly to the issue here—if, as the jury's question posited, petitioner was an "active participant" in the robbery, nothing more was necessary to convict petitioner of felony murder, aside from a nexus or connection of the murder to the robbery in which petitioner actively participated.  Petitioner does not, and could not dispute the logical connection, both causally and temporally, between the robbery and the murder.  Under these circumstances, petitioner's status as an active participant in the robbery *did imply* his guilt of murder, regardless of whether he was the actual shooter.  So, in the abstract, the answer to the jury's question would be "yes."

////

1   However, although the law in general does not support petitioner's argument, the

2   circumstances of his trial make relying on <u>Cavitt</u> problematic.  California felony murder jury

3   instructions are divided into several scenarios.  Petitioner's jury was instructed with CALCRIM

4   540A—during the underlying felony, defendant committed the act which caused death (here the

5   shooting).  CT 193, RT 931.[3]  The prosecutor emphasized this theory to the jury.  RT 950.[4]  The

6   jury (for some unexplained reason) was *not* instructed with CALCRIM 540B which defines the

7   doctrine when a *co-participant* in the robbery commits the fatal act.  In this scenario, aiding and

8   abetting is a potential, alternative situation set forth in a bracketed manner in the instruction, but

9   the instruction, as is clear from California law, does not require such a finding.  Being an active

10  participant in the robbery which has a nexus to the death is all that is required.

11   Petitioner therefore posits the inconsistent verdict: he was found guilty of murder under

12  the instructions given, with the inability of the jury to find for the enhancement that he used a

13  firearm in the crime, as a demonstration that the trial judge's refusal to answer the jury's question

14  caused petitioner to be convicted on another theory not before the jury—aiding and abetting the

15  murder.  No matter how respondent could spin this inconsistency, petitioner could not have been

16  convicted of murder *under any theory presented to the jury* unless he *used* a firearm.  Whether the

17  shooting was purposeful, accidental, negligent, or what have you, in order to be found guilty of

18  murder, the instructions given required the jury to find petitioner as the shooter, i.e., the person

19  causing the victim's gunshot death during the robbery.  However, petitioner's logical argument

20  regarding inconsistency in the verdict is in search of a viable legal theory in this habeas action.

21   There is no constitutional requirement that a jury's question always be directly answered.

22  While a trial court must attempt to clear away a jury's confusion, <u>Bollenback v. United States</u>,

23  326 U.S. 607 (1946), simply referring the jury back to correct jury instructions is a viable way to

24  alleviate the confusion.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 231-232 (2000).  No one here argues

25  that the given instructions were incorrect under California law.  And, because answering the

26   _____
[3]  The court appreciates respondent's electronic filing of the record, in addition to any paper
27  filing, in that access to pounds of paper files is not always a judge's first choice.
[4]  Of course, the other theory at trial, petitioner intentionally killed the victim, requires that
28  petitioner be the shooter.

1    jury's question directly may well have been seen as directing the jury to find in a certain way, the

2    trial judge wisely backed off answering the jury directly.

3         Petitioner insists, however-- that merely referring the jury back to the (correct)

4    instructions, and not directly answering that (under the instructions given) simply being a

5    participant in the robbery did not imply guilt (of the murder) -- gave them no option but to rely on

6    an aiding and abetting the "real shooter" theory to convict petitioner of murder—because, after

7    all, the jury could not find petitioner the shooter when it came to the personal use of a firearm

8    enhancement.  This hypothesis is not true.  Given the correct instructions which permitted the jury

9    to find guilt if petitioner was the shooter, instructions which indisputably did not present any

10   aiding and abetting theory, the jury had the opportunity to find petitioner guilty of murder

11   because he was the shooter— which it did.  Under the only instructions given, the jury did find

12   guilt, i.e., that petitioner either purposefully shot the robbery victim and/or was guilty of felony

13   murder (as the actual shooter regardless of intent).[5]

14        Thus, at bottom, petitioner's real, and only remaining, argument is simply that the

15   undoubtedly inconsistent verdict cannot stand, and that allowing such is a violation of due

16   process.  However logical that argument might seem, petitioner is incorrect.  As respondent has

17   noted, the Supreme Court has held, in United States v. Powell, 469 U.S. 57 (1984), that a jury's

18   guilty finding on one count which is inconsistent with a not guilty finding on another count, is *not*

19   Constitutional error.  In Powell, as is the case here, there was no issue of incorrect jury

20   instructions.  However, the jury found its defendant not guilty of conspiracy to possess and

21   distribute cocaine, and actual possession with intent to distribute cocaine, but guilty of using a

22   telephone to commit the underlying possession/distribution felony.  Powell argued that because

23   the true existence of the underlying felony was a predicate to the telephone count, the verdicts

24   were inconsistent.  The Supreme Court did not doubt this logic.  However, it held that because the

25   jury's state of mind in acquitting on the underlying felony could not be actually explored post-

26

27   _____

     [5]  Nor can petitioner present the post-trial statements of one juror as to what that juror's
28   deliberative process might have been (aiding and abetting) to show that the jury reached its
     murder verdict on that basis.  Tanner v. United States, 483 U.S. 107 (1987).

1    trial, and the unable-to-be-explained verdict could have been as a result of mistake or leniency or

2    some other factor, all that was required was sufficient evidence on the count for which guilt was

3    found.  Powell at 66-67.  It specifically held that no Constitutional error was presented by the

4    inconsistent verdict scenario.  Id. at 65.

5            Without discussion, the Court of Appeal here assumed error as a result of the trial court

6    not directly answering the jury question, and ostensibly because of the inconsistent verdicts, and

7    then found the error harmless.  This is difficult logic, but ultimately of no consequence since there

8    was no error in the first place.[6]  Indeed, the Court of Appeal's harmless error analysis mirrors

9    somewhat the reasoning of the Powell court.  It is repeated here for that purpose as well as to

10   show that there was ample evidence on which the jury could have found petitioner to be the

11   shooter.

12           Even if Ford had preserved this argument for appeal, we would reject it because
13           Ford cannot demonstrate prejudice from any assumed error.  (People v. Roberts
             (1992) 2 Cal.4th 271, 326 applying People v. Watson (1956) 46 Cal.2d 818, 836
14           (Watson ) harmless error standard] ).  Ford claims the jury would have acquitted
             him of murder "absent the incomplete response to the jury's question" because at
15           least one juror believed he "was not the shooter but was an aider and abettor."
             According to Ford, "one or more jurors did not believe that [he] personally fired
16           the gun and thus convicted him of murder on an aiding and abetting theory."

17
             We are not persuaded.  The prosecution charged Ford with murder "during the
18           course of Mr. Ford trying to take [Martinez's] phone" under two theories, first
             degree felony murder and second degree malice aforethought.  The prosecution did
19           not pursue an aiding and abetting theory.  That the jury found Ford had not
             personally used a firearm when committing the murder does not mean it concluded
20           Ford was not a perpetrator who shot Martinez, or that the jury could have only
             convicted him as an aider and abettor.  The jury could have believed Ford had a
21           firearm which accidentally discharged during the attempted robbery, killing
             Martinez; this would have been consistent with CALCRIM No. 540, which
22           provides a "person may be guilty of felony murder even if the killing was
             unintentional, accidental, or negligent." [[7] undersigned's footnote]
23

24

25   _____

26   [6]  If inconsistent verdicts were a Constitutional error, it is difficult to see how such could be
     harmless—it is what it is, i.e., a finding of yes you did, but no you did not, and there is no way to
27   actually understand what the jury was really thinking.
     [7]  However, this last sentence begs the issue as one would have to have "used" a firearm even if
28   the killing was unintentional, accidental, etc.

                                                      16

At trial, the prosecution offered substantial evidence demonstrating Ford was guilty of murder: (1) Ford's palm print was found on Martinez's newly-washed car and Ford did not explain how his hand came into contact with Martinez's car; (2) shortly before the shooting, witnesses saw a man matching Ford's general appearance and a car similar to the one Ford drove; (3) Ford told his girlfriend he was happy he had not been charged with murder, he wished "it didn't have to happen," and was disappointed with himself because "the only thing you gonna get out of a gun is you gonna throw down with it or you gonna shoot somebody with it[;]" (4) Ford bragged on his Facebook page about being a good shooter ("knockin' [expletive] down") and not getting caught ("aint nobody talked to me since I got outa jail ... Real killas move n silence"); and (5) Ford was found with multiple cell phones in his car a few days after Martinez's murder, suggesting a motive to rob and/or kill Martinez. Based on this evidence, it is not reasonably probable the jury would have acquitted Ford of murder had the court—as Ford has suggested—answered the jury's question with a simple "'no.'" (People v. Robinson (2005) 37 Cal.4th 592, 634–635 [assumed error under section 1138 was harmless].)

People v. Ford, at *4-5.

The evidence that petitioner was the shooter was AEDPA sufficient, and sufficient in any event. Petitioner posits no legitimate argument that the above reasoning is so deficient that reasonable jurists could not find the same as the Court of Appeal.

C.      Ineffective Assistance of Counsel—Juror Question

For the reasons set forth above regarding the merits of the juror question issue, counsel's actions could neither have been deficient nor prejudicial as those terms are defined in Strickland v. Washington, 466 U.S. 668 (1984).

Moreover, with the benefit of hindsight, it appears that defense counsel was very smart in not pushing the issue too far. The prosecution might have awoken to the fact that on the evidence presented, especially with the defense contending that another participant in the robbery committed the murder, CALCRIM 540B was a viable instruction—one which did not require petitioner to be the shooter, nor did it require an aiding and abetting mentality.

D.      Conviction on a Legally Incorrect Theory

This issue is simply a reprise of the juror question issue framed in terms of the possibility that the jury convicted on a "legally invalid" theory, i.e., the not presented aiding and abetting theory. This is a difficult issue for petitioner in that all agreed in the trial court, and agree here,

17

1    that aiding and abetting was not a theory in the case, and no instructions were given to that effect.

2    Petitioner's argument that the jury must have utilized this theory when it could not reach

3    agreement on whether petitioner was the shooter has been rejected above, and is rejected here.

4    There were two theories before the jury—petitioner intentionally fired the shot which

5    killed the victim during the robbery; petitioner caused the death during participation in the

6    robbery, and hence was liable for first degree felony however the shooting went down, i.e.,

7    accidental, negligent purposeful.  Petitioner's speculation as to what the jury "must have thought"

8    in its deliberative process when it found petitioner guilty of murder, but could not unanimously

9    agree that petitioner was the shooter for enhancement purposes, is simply non-actionable

10   speculation.

11   E.      Admission of Petitioner's Facebook Message

12   Petitioner contends that admission of his Facebook message(s) was a violation of due

13   process.  Part of the Facebook entries were characterized by the Court of Appeal and set forth

14   above; the holding based on state law finding that the entries were sufficiently probative to

15   outweigh any prejudice was as follows:

16

17           Ford contends the Facebook message was irrelevant because "it was not an
             admission of, and had nothing to do with, the homicide for which [he] was
18           standing trial."  We disagree with Ford's self-serving interpretation of the
             Facebook message.  A plausible reading of the message is Ford murdered
19           Martinez, a disputed fact at trial. In the message, Ford implicitly admitted
             committing a recent murder when he claimed he did not have to take credit for an
20           attempted murder.  He stated, why "would I brag on a job I didn't even
             complete.... I don't need credit for an attempt...."  By claiming he was "too good of
21           a shooter to hit a nigga that many times and not knock they ass down [,]" Ford
             implied that when he shot someone, he did not miss.  Finally, Ford bragged that,
22           unlike the accusation made by the recipient of the Facebook message, "Real killers
             move in silence[,]" suggesting he quickly shot Martinez in the head without being
23           noticed and immediately disappeared.  We conclude the court did not abuse its
             discretion by determining the Facebook message was relevant.
24

25

26   People v. Ford, at *9.

27   Of course, in this federal habeas actions, the undersigned will not review any alleged error

28   of state law.  When construed as a federal due process claim, this claim should be denied because

18

1   the U.S. Supreme Court has never held that the admission of prejudicial evidence (assuming it

2   could be found so here) is actionable due process error.  Holley v. Yarborough, 568 F.3d 1091,

3   1101 (9th Cir. 2009); Crawford v. Foulk, 2016 WL 4120613 (E.D. Cal. 2016).

4   F.      Cumulative Error

5           There is no error to cumulate; this claim should be denied.

6                                            CONCLUSION

7           The petition should be denied.  Petitioner should be granted a Certificate of Appealability

8   on Claims 2-4.

9           These findings and recommendations are submitted to the United States District Judge

10  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

11  after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties.  Such a document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14  shall be served and filed within fourteen days after service of the objections.  The parties are

15  advised that failure to file objections within the specified time may waive the right to appeal the

16  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17  Dated:  February 8, 2017

18                                  /s/ Gregory G. Hollows
                                    UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28